# Third District Court of Appeal

## State of Florida

Opinion filed July 23, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-1463
Lower Tribunal No. 21-24443-CA-01
_____

**Tania Almagro, et al.,**
Appellants,

vs.

**School Board of Miami-Dade County,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Daryl E. Trawick, Judge.

Thomas E. Elfers; Craig J. Freger (Pembroke Pines), for appellants.

Bryant Miller Olive P.A., and David C. Miller, Frederick J. Springer and Elizabeth W. Neiberger, for appellee.

Before SCALES, C.J., and EMAS[1], and GOODEN, JJ.

SCALES, C.J.

_____

[1] Did not participate in Oral Argument.

Appellants Tania Almagro, et al.[2] sought damages and mandamus relief after appellee School Board of Miami-Dade County failed to adopt a grandfathered salary schedule for teachers prior to July 1, 2014, as required by section 1012.22(1)(c)4. of the Florida Statutes (2024). On July 24, 2024, the trial court granted summary judgment in favor of the School Board on several grounds, including Appellants' lack of standing.

We agree with the trial court that, without specific statutory authorization to pursue a private cause of action for violation of the statute, Appellants lacked the requisite standing to enforce the statute via a lawsuit against the School Board. In other words, no express language in section 1012.22 confers upon teachers a private right of action. See Moon-Vileno v. Fla. Ass'n of Court Clerks, Inc., 383 So. 3d 128, 131 (Fla. 1st DCA 2024) ("The Legislature has not provided a cause of action in the statute to afford Appellants a judicial remedy in this case."); Am. Towing of Miami, LLC v. Espinal, 318 So. 3d 598, 601 (Fla. 3d DCA 2021) ("[W]e . . . discern no legislative intent to create a private cause of action from the actual language used in the statute[.]"). Nor do we discern from the legislative intent of section 1012.22 that a private right of action may be judicially implied. QBE Ins. Corp.

---

[2] Appellants are composed of twenty-seven Miami-Dade County school teachers.

v. Chalfonte Condo. Apartment Ass'n, 94 So. 3d 541, 550-51 (Fla. 2012).

Because section 1012.22 does not supplant collective bargaining between a

school board and a teachers union, we cannot infer that it provides teachers

a private cause of action related to their annual compensation.[3]

We therefore affirm the trial court's summary judgment in favor of the

School Board.

Affirmed.

---

[3] The existence of the teachers' individual annual contracts, which "incorporates all applicable laws" (presumably including section 1012.22), does not change our standing analysis when the basis of Appellants' lawsuit is breach of the statute.

GOODEN, J. (specially concurring)

I fully concur in the majority's opinion as no express or implied private right of action exists. In addition to lack of standing, the trial court also correctly found that this action was barred by sovereign immunity. I write separately to address the Florida Constitution and the Florida Supreme Court's decision creating a waiver of sovereign immunity for contracts.

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." Va. Office for Prot. & Advoc. v. Stewart, 563 U.S. 247, 253 (2011). It is based "on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907). "The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 760 (2002).

The doctrine of sovereign immunity "has been a fundamental tenet of Anglo-American jurisprudence for centuries." Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp., 908 So. 2d 459, 471 (Fla. 2005). It was well-entrenched in the common law of England. See 1 William Blackstone, Commentaries on the Laws of England 235–37 (1st ed. 1765); id. at 246

4

("Besides the attribute of sovereignty, the law also ascribes to the king, in his political capacity, absolute perfection. The king can do no wrong.").  Since at least the reign of King Edward I, the Crown has not been subject to suit unless it expressly consented.  See generally United States v. Lee, 106 U.S. 196, 205 (1882); Ludwik Ehrlich, Proceedings Against the Crown (1216-1377), Oxford Studies in Social and Legal History, Vol 6, no. 12 (Paul Vinogradoff ed., 1921); Louis L. Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 2 (1963) ("By the time of Bracton (1268) it was settled doctrine that the King could not be sued *eo nomine* in his own courts.").

These broad principles were ever present in the founding of our great country.  In The Federalist No. 81, Alexander Hamilton wrote,

> It is inherent in the nature of sovereignty not to be amenable to the suit of an individual WITHOUT ITS CONSENT.  This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.  Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal.  The circumstances which are necessary to produce an alienation of State sovereignty . . . flows from the obligations of good faith.  The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force.  They confer no right of action, independent of the sovereign will.

5

The Federalist No. 81 (Alexander Hamilton). See also The Federalist No. 32 (Alexander Hamilton) ("But as the plan of the convention aims only at a partial union or consolidation, the State governments would clearly retain all the rights of sovereignty which they before had . . . ."); The Federalist No. 39 (James Madison) (explaining states retain "a residuary and inviolable sovereignty"); Federal Farmer No. 3 (Oct. 10, 1787) ("[T]he states are now subject to no such actions[.]"); Brutus No. 13 (Feb. 21, 1788) ("It is improper, because it subjects a state to answer in a court of law, to the suit of an individual. . . . The states are now subject to no such actions. All contracts entered into by individuals with states, were made upon the faith and credit of the states; and the individuals never had in contemplation any compulsory mode of obliging the government to fulfil its engagements."); 3 Debates on the Federal Constitution 533 (J. Elliot ed., 1854) (noting James Madison maintained "[i]t is not in the power of individuals to call any state into court"); id. at 555 (observing John Marshall stated it was "not rational to suppose that the sovereign power should be dragged before a court"). Our Founding Fathers "regarded sovereign immunity as jurisdictional." Mowrer v. U.S. Dep't of Transp., 14 F.4th 723, 741 (D.C. Cir. 2021) (Katsas, J., concurring).

During this Founding era, the states adopted the common law of England as their own—through their constitutions, statutes, or judicial

6

opinions.  See Bryan A. Garner, et al., The Law of Judicial Precedent 737–38 (2016).  See, e.g., Art. 25, Del. Const. (1776) ("The common law of England, as-well as so much of the statute law as has been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature[.]"); Art. XXXV, N.Y. Const. (1777) ("And this convention doth further, in the name and by the authority of the good people of this State, ordain, determine, and declare that such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same."); Art. XXII, N.J. Const. (1776) ("[T]he common law of England, as well as so much of the statute law, as have been heretofore practiced in this Colony, shall still remain in force, until they shall be altered by a future law . . . ."); Va., Ordinances of Convention ch. V, § I, VI (1776) ("[The] common law of England, [and] all statutes or acts of Parliament made in aid of the common law prior to the fourth year of the reign of King James the first . . . shall be the rule of decision, and shall be considered as in full force, until the

7

same shall be altered by the legislative power of this colony."); Acts of the N.C. Gen. Assembly, 1778, ch. 5, § II, 24 N.C. Sess. Laws 162 ("[A]ll such . . . Parts of the Common Law, as were heretofore in Force and Use within this Territory . . . are hereby declared to be in full Force within this State."); Fitch v. Brainerd, 2 Day 163 (Conn. 1805). Indeed, the English common law—including the doctrine of sovereign immunity—was adopted by the Territory of Florida in 1822. Fla. Terr. Acts 1822, p. 50. See also Fla. Terr. Acts 1823, p. 111; § 2.01, Fla. Stat. (1829); Am. Home Assurrance Co., 908 So. 2d at 471("The doctrine was a part of the English common law when the State of Florida was founded and has been adopted and codified by the Florida Legislature.").

The citizens of our great State believed the doctrine to be so important that they enshrined it into our 1868 Constitution. It provided: "Provision may be made by general law for bringing suit against the State as to all liabilities now existing or hereafter originating." Art. IV, § 19, Fla. Const. (1868); see also Art. III, § 22, Fla. Const. (1885). This exact provision is still in our Constitution today. Art. X, § 13, Fla. Const. (1968). Its plain text only allows waiver "by general law," which is law that "operates universally throughout the state, or uniformly upon subjects as they may exist throughout the state, or uniformly within permissible classifications by population of counties or

8

otherwise, or is a law relating to a state function or instrumentality." State ex rel. Landis v. Harris, 163 So. 237, 240 (Fla. 1934). See, e.g., Ch. 73-313, § 1, Laws of Fla. (1973) (currently § 768.28, Fla. Stat. (2011)) (general law waiving of sovereign immunity in tort for personal injury, wrongful death, and loss of property); Ch. 67-2204, § 1, Laws of Fla. (1967) (currently § 768.14, Fla. Stat.) (general law waiving sovereign immunity where state files suit in tort).

In 1888, the Florida Supreme Court first addressed the doctrine of sovereign immunity. In McWhorter v. Pensacola & A.R. Co., 5 So. 129 (Fla. 1888), the Court analyzed whether the suit was one against the State. "If it is, it is well understood that it cannot be sustained, unless by consent of the state." Id. at 131. The Court explained,

> [T]he rule which forbids a suit against officers, because in effect a suit against the state, applies only where the interest of the state is through some contract or some property right of hers, or where her interest is in a suit brought or threatened by her officers in her own name to enforce some alleged claim of hers. And it is important to observe the character of the interest. It is not enough that the state should have a mere interest in the vindication of her laws, or in their enforcement as affecting the public at large, or as they affect the rights of individuals or corporations, but it must be an interest of value to herself as a distinct entity,—of value in a material sense. She has an interest in the success of the policy of her laws, and in the just administration and execution of those laws, yet it is not an interest on which she can be said to be a party affected by any private suit arising under them, when it is not another and more

9

direct interest inhering in some separate right or claim of right of her own.

Id. at 133.

For almost a century, the Florida Supreme Court consistently construed this provision as providing immunity for contracts of the State. See Bloxham v. Fla. Cent. & Peninsular R.R. Co., 17 So. 902, 919 (Fla. 1895) ("No such [general law] provision having been made by the legislature, the section quoted is inoperative to change the general principles upon which we hold that the state is not liable to be sued."); Hampton v. State Bd. of Educ., 105 So. 323, 327 (Fla. 1925) ("The immunity of the state from suit applies where a contract or property interest of the state is involved."); S. Drainage Dist. v. State, 112 So. 561, 563 (Fla. 1927); State ex rel. Davis v. Love, 126 So. 374, 375 (Fla. 1930); Gay v. S. Builders, Inc., 66 So. 2d 499, 501 (Fla. 1953) ("[W]ere the State a private corporation suit on the contract would be the proper remedy of the contractor. But the State enjoys immunity from suit as one of the attributes of sovereignty.").

Despite the plain language of the Constitution, almost a century of precedent, and no general law enacted by the Legislature expressly waiving immunity for contracts, the Florida Supreme Court abruptly changed course in 1984. But see In re Advisory Op. to the Governor, 112 So. 2d 843, 847 (Fla. 1959) ("[T]he construction of an old Constitution still applies to a new

10

Constitution if the wording is the same. . . ."); Barndollar v. Sunset Realty Corp., 379 So. 2d 1278, 1280 n.1 (Fla. 1979); State v. Miami Beach Redevelopment Agency, 392 So. 2d 875, 885 (Fla. 1980) ("Decisions construing predecessor provisions of the constitution having the same import as current provisions are sources of authority for the construction of the successor provisions."); Israel v. DeSantis, 269 So. 3d 491, 495 (Fla. 2019) ("Where the language of the Constitution is clear, unambiguous, and addresses the matter in issue, then it must be enforced as written, as the constitutional language must be allowed to speak for itself.") (citation modified).

In Pan-Am Tobacco Corp. v. Dep't of Corrections, 471 So. 2d 4 (Fla. 1984), the Florida Supreme Court first recognized that a party can sue the State for a breach of contract. As the Court explained, the Legislature, while it explicitly waived sovereign immunity in tort, has not done so in contract. Id. at 5. The Court turned to laws which allowed the State to enter a contract and noted that a contract that is not mutually enforceable is illusory. Id. It reasoned that a party must be able to sue the State to enforce those contracts. Id. The Court, however, limited this judicially made waiver to only express, written contracts. Id. at 6. See generally Univ. of Fla. Bd. of Trs. v. Rojas, 351 So. 3d 1167, 1170 (Fla. 1st DCA 2022), quashed, No. SC2023-

11

0126, 2025 WL 1969959 (Fla. July 17, 2025) ("The second exception is of judicial creation. . . ."); City of Fort Lauderdale v. Israel, 178 So. 3d 444, 446 (Fla. 4th DCA 2015) ("There are no statutory provisions for sovereign immunity, or its waiver, with regard to contracts. That issue has fallen instead to the courts to address.").

But this decision strays from the original public meaning of the Constitution at the time it was ratified. Planned Parenthood of Sw. & Cent. Fla. v. State, 384 So. 3d 67, 77 (Fla. 2024). The Great Dissenter—Justice John Marshall Harlan—aptly observed:

> The preservation of the dignity and sovereignty of the states, within the limits of their constitutional powers, is of the last importance, and vital to the preservation of our system of government. The courts should not permit themselves to be driven by the hardships, real or supposed, of particular cases, to accomplish results, even if they be just results, in a mode forbidden by the fundamental law. The country should never be allowed to think that the Constitution can, in any case, be evaded or amended by mere judicial interpretation, or that its behests may be nullified by an ingenious construction of its provisions.

Ex parte Young, 209 U.S. 123, 182–83 (1908) (Harlan, J., dissenting). See also Marbury v. Madison, 5 U.S. 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect."); George Washington, Washington's Farewell Address to the People of the United States (Sept. 19, 1796) ("If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be

12

corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation; for, though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed.").

Because the Florida Supreme Court's decision in <u>Pan-Am Tobacco Corp.</u> is not true to our Constitution's text, it should be reexamined. We should strive to return our State to the original meaning of our Constitution as it was ratified by the people. <u>Planned Parenthood of Sw. & Cent. Florida</u>, 384 So. 3d at 77. While allowing suits to enforce contracts may be good policy, it is not the Court's role to judicially create this exception, overriding the express will of the people. <u>See</u> <u>Gray v. Bryant</u>, 125 So. 2d 846, 852 (Fla. 1960) (explaining the constitution "must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied."). The judiciary is not a policy-maker—that is the Legislature's job. <u>See</u> <u>Gessa v. Manor Care of Fla., Inc.</u>, 86 So. 3d 484, 499 (Fla. 2011) (Polston, J., dissenting) ("The Florida Legislature, not this Court, should decide Florida's public policy."). The Legislature holds the authority to enact general law in those situations in which it wishes to waive sovereign immunity. To allow otherwise violates the express separation of powers set forth in our Constitution. <u>See</u> Art. II, § 3, Fla. Const. (1968).

13